## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| NATIONAL COUNCIL OF JEWISH WOMEN, GREATER NEW ORLEANS CHAPTER,<br><br>       Plaintiff,<br>v.<br><br>NANCY LANDRY, in her official capacity as Secretary of State for Louisiana; and CHARLENE MEUAX-MENARD, Lafayette Parish Registrar of Voters,<br><br>       Defendants. | Civil No.: _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## NATURE OF THE CASE

1.      When SB 436 took effect on January 1, 2025, Louisiana joined a handful of states that require prospective voters to submit additional "proof" of their citizenship, beyond a sworn statement of eligibility, when they register to vote. Although these laws vary in their approaches, particularly regarding what "proof" suffices, they have consistently resulted in the exclusion of *citizens* from the franchise.

2.      In assessing such laws, courts have been consistent too. In case after case, federal courts—including the U.S. Supreme Court—have held "proof-of-citizenship" requirements unlawful under the U.S. Constitution, federal statutory law, or both. In particular, courts have found that proof-of-citizenship requirements violate the National Voter Registration Act, which bars states from adding unnecessary requirements to the voter registration process. To date, no state has successfully defended a law that requires additional proof of citizenship for voter registration on the merits to final judgment.

3.      Laws that require additional "proof" of citizenship, beyond a voter's affirmation, result in exclusion of citizens because "proving" citizenship requires prospective voters to provide information they may not have or documents that are cumbersome and expensive for many voters to obtain. That is why for decades, Louisiana, other states, and the federal government have all allowed voters to establish their citizenship by attesting to it on penalty of perjury. There is no evidence in Louisiana or elsewhere that this attestation—along with criminal prohibitions on noncitizen voting—is insufficient. Indeed, as in other states that have passed proof-of-citizenship laws, the proponents of SB 436 could not identify any concrete examples of noncitizen voting in the state, even as they urged the bill's passage.

4.      Making matters worse, while SB 436 requires that each voter registration applicant "shall include with his application proof of United States citizenship," La. Stat. Ann. § 18:104(D)(2),

1

it says nothing about what form that "proof" may take. And even now, seven months after the bill's effective date, Defendant Nancy Landry, the Louisiana Secretary of State, still has not issued any guidance to answer that question. Thus, as it stands—to solve a nonexistent problem—Louisiana law requires prospective voters to prove their citizenship but gives them no information about how to do so.

5.      The law's vague terms chill otherwise qualified citizens from registering to vote and helping others register to vote—particularly because Louisiana law authorizes criminal penalties for attempting to register improperly or misinforming voters about registration requirements.

6.      Meanwhile, since January 2025, Defendant Landry has taken steps to implement the law by seeking to require voters to submit additional information with their voter registration applications, which the state plans to use to confirm their citizenship through various untested and unreliable databases. Inevitably, by taking this approach, the state will falsely identify qualified voters as noncitizens or as people whose citizenship cannot be confirmed, placing their registration status in limbo until they can prove that they are citizens.

7.      The mission of Plaintiff National Council of Jewish Women, Greater New Orleans Chapter is to improve the quality of life for women, children, and families and safeguard individual rights and freedoms, consistent with Jewish values. Assisting qualified citizens with voter registration is a core way Plaintiff serves that mission. SB 436's proof-of-citizenship requirement—whether implemented under Defendant Landry's current plans or one of the other methods proposed in the legislature—hampers Plaintiff's ability to carry out its voter registration efforts and makes these efforts both less efficient and less effective. It also makes voting more burdensome for Plaintiff's members.

8.      Plaintiff brings this lawsuit seeking a declaratory judgment that SB 436's proof-of-citizenship requirements violate the National Voter Registration Act, the Civil Rights Act, and the Constitution, and for permanent injunctive relief against the law's enforcement.

## JURISDICTION AND VENUE

9.      Plaintiff National Council of Jewish Women, Greater New Orleans Chapter brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution and the National Voter Registration Act, 52 U.S.C. § 20507 *et seq.*

10.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws of the United States and asserts the deprivation, under color of state law, of rights under the U.S. Constitution.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because at least one defendant resides in this district; all defendants are Louisiana residents; and a substantial part of the events that gave rise to Plaintiff's claims for relief occurred in this district.

12.     This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

13.     Plaintiff National Council of Jewish Women, Greater New Orleans Chapter is a nonprofit organization that works to improve the quality of life for women, children, and families, and safeguard individual rights and freedoms, consistent with Jewish values. Among those is the right to vote.

14.     The National Council of Jewish Women, founded in 1893, has sections (or local chapters) in 34 states and the District of Columbia. The Greater New Orleans Chapter, founded in

3

1897, has more than 1,000 dues-paying members. It has worked to advance voting rights since its founding, and that work has also been central to the Greater New Orleans Chapter's efforts to advance its mission.

15.     Voting holds special significance in the Jewish faith. The Torah, which Jews consider the word of God, requires civil engagement, not only within Jewish communities but society at large. Accordingly, many rabbis and sages have framed voting as a mitzvah—a commandment or sacred obligation. As a result, Jewish organizations like the National Council of Jewish Women are dedicated to advancing the right to vote, both as a matter of justice and as an expression of their religious faith.

16.     To that end, voter registration assistance is one of the core services that the Greater New Orleans Chapter offers in the community. Along with the League of Women Voters, the National Council of Jewish Women, Greater New Orleans Chapter co-leads a nonpartisan coalition dedicated to registering voters, informing them about issues related to elections, and getting out the vote.

17.     As part of that work, the Greater New Orleans chapter regularly conducts voter registration drives, particularly in New Orleans public high schools. The Greater New Orleans Chapter and its coalition partners coordinate voter registration drives at every public high school in New Orleans. At the high schools, volunteers for the Greater New Orleans Chapter both offer students paper registration forms and set up a bank of computers where students can register to vote online. In 2024, the Greater New Orleans Chapter registered approximately 2,000 high school students to vote.

18.     SB 436's proof-of-citizenship requirement will severely impede Plaintiff's ability to do this essential work, making it impossible to register voters at anywhere near the current rates. To start, the Greater New Orleans chapter currently has no means of scanning or photocopying students'

4

"proofs" of citizenship to include with their voter registration applications. And if it obtained a means to do so, copying these "proofs" for registration applications will make each registration more time consuming to complete—and make students less likely to complete the registration process at all.

19.     Moreover, based on Plaintiff's experience registering student voters, many students will be unable to provide the "proof" the law and Defendant Landry's planned implementation of the law requires. About half of the students the Greater New Orleans Chapter helps register lack basic information they may need to register to vote, and Plaintiff has to work with the high school's main office to locate this information. This problem is especially common at high schools that primarily serve students from low-income communities. Requiring voters to submit the additional information Defendant Landry seeks to add to the registration application would make it impossible for Plaintiff to register voters at its current rates because of the additional steps it will frequently require.

20.     On information and belief, many students also do not have documents that prove their citizenship. And even students who do have such documents somewhere do not regularly carry them with them, so they will be unlikely to have immediate access to them at school on the days when Plaintiff's volunteers are present to help with voter registration.

21.     To continue to provide voter registration services in light of these problems, Plaintiff will need to inform students about the new requirements, help them obtain any required documents and make copies of any required "proof" of citizenship to include with their voter registration applications, and to help them track down any additional information they do not have readily available that may be required.

22.     However robust these efforts may be, it will be impossible for the Greater New Orleans Chapter to carry out its voter registration drives as effectively as it could before the proof-of-citizenship requirement was imposed.

5

23.     The harm that SB 436 will inflict on Plaintiff's work is worsened by SB 436's failure to specify what constitutes adequate "proof" of citizenship. Each July, the Greater New Orleans Chapter begins planning its voter registration drives for students. But this year, it has been unable to create a concrete plan without certainty (or even guidance) as to what prospective voters can submit to satisfy the proof-of-citizenship requirement. This is especially harmful to Plaintiff's voter registration work because helping new registrants prove their citizenship will require additional resources, but without any guidance, Plaintiff cannot prepare those resources or otherwise plan its registration effort.

24.     Worse, Plaintiff faces criminal consequences if it gets the law wrong. Louisiana law makes it a crime to knowingly, willfully, or intentionally "misinform, directly or indirectly, any voter or prospective voter in matters concerning . . .  voter registration." La. Stat. Ann. § 18-1461.4(A)(1). Absent any guidance about what the new law actually requires, the threat of these criminal consequences is likely to chill potential volunteers from participating in Plaintiff's registration drives.

25.     Plaintiff's members are also harmed by SB 436's proof-of-citizenship requirement. Many of Plaintiff's members are qualified Louisiana voters, some of whom are not currently registered to vote. To register, these members will have to comply with SB 436, which will burden them by making registration more onerous. Given the state's lack of guidance about how to comply with the law, these members will also need to navigate the law's vague terms to determine whether or not they must submit additional documentation and, if so, what documents will suffice to "prove" that they are citizens. If Defendant Landry succeeds in her plan to require additional information, these members must now navigate the more complicated voter registration process.

26.     Plaintiff's unregistered members also include individuals who do not have documents that "prove" their citizenship in their current legal name, including members who have

changed their names after marriage. Given the state's intent to check voter registration applicants' citizenship status in various government databases, members who have changed their names also risk being subjected to additional requirements or exclusion from the franchise because they may be mismatched or not matched at all because of the name change.

27.     In addition, Plaintiff has members who were not born in the United States and have since become naturalized citizens. The law's vague guidance at present subjects these members to additional scrutiny during the registration process, which may cause delays, additional questions, or require them to provide documentary proof of their citizenship. Under Louisiana's current plan for implementing SB 436, these members would also need to provide their unique immigration identifiers to register to vote, a requirement the state does not impose on natural-born citizens.

28.     Defendant Nancy Landry is the Secretary of State of Louisiana and is named as a Defendant in her official capacity.

29.     Defendant Landry is the chief election officer for the state and is responsible for "administer[ing] the laws relating to custody of voting machines and voter registration." La. Stat. Ann. § 18:18(A).

30.     Defendant Landry is charged with, *inter alia*, "direct[ing] and assist[ing] the registrar of voters" with respect to voter registration, "[p]rescrib[ing] uniform rules, regulations, forms, and instructions" with respect to "forms of applications for registration," and "coordinat[ing]" Louisiana's responsibilities under the NVRA. La. Stat. Ann. § 18:18(A)(2), (3), and (6).

31.     Defendant Landry is being sued in her official capacity for actions taken under color of law to enforce SB 436's proof-of-citizenship requirements.

32.     Charlene Meaux-Menard is the Registrar of Voters for Lafayette Parish.

33.     Defendant Meaux-Menard is being used in her official capacity for actions taken under color of law to enforce SB 436's proof-of-citizenship requirements.

7

## STATEMENT OF FACTS AND LAW

34.    On June 11, 2025, Louisiana Governor Jeff Landry signed SB 436 into law as Act 500. The bill makes two changes to Louisiana's voter registration statute.

35.    First, SB 436 amends Louisiana's Election Code to state that no person who is not a United States citizen can register to vote. Plaintiff does not challenge this provision, though this change is unnecessary. Article I, Section 10 of the Louisiana Constitution already made it illegal for noncitizens to register to vote in Louisiana. And federal law similarly prohibits noncitizens from voting in federal elections. *See* 18 U.S.C. § 611.

36.    Second—and at issue in this case—SB 436 amends Section 104 of Louisiana's Election Code to require that, when submitting a voter registration application, "Each applicant shall include with his application proof of United States citizenship." La. Stat. Ann. § 18:104(D)(2).

37.    The law does not specify what form this newly required "proof" of citizenship must take.

### A. The National Voter Registration Act restricts states from adding unnecessary requirements to voter registration forms.

38.    Federal law sets limits on what information and documentation states can require prospective voters to submit as part of the registration process.

39.    Specifically, Louisiana is subject to the National Voter Registration Act (NVRA), which streamlines the voter registration process and requires states to provide simplified, voter-friendly systems for registering to vote. *See generally* Pub. L. No. 103–31, 107 Stat. 77 (1993).

40.    In enacting the NVRA, Congress recognized that "unfair registration laws" can "have a direct and damaging effect on voter participation," 52 U.S.C. § 20501(a)(3), and sought to improve access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," *id.* § 20501(b)(1).

41.     To that end, the NVRA directed the U.S. Election Assistance Commission ("EAC") to "develop a mail voter registration application form for elections for Federal office" in consultation with state election officials. *Id*. § 20508(a)(2).

42.     This "Federal Form" must meet several parameters. It "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id*. § 20508(b)(1). It must also include a statement that "specifies each eligibility requirement (including citizenship)" and requires the applicant to attest, under penalty of perjury, that she "meets each such requirement." *Id*. § 20508(b)(2); *see also id.* § 20508(b)(3), (4) (additional parameters for the Federal Form).

43.     The Federal Form does not require (and has never required) applicants to submit any "proof" of eligibility beyond the attestation requirement.

44.     Rather, for establishing an applicant's eligibility to vote, the attestation requirement set forth in the NVRA is the "presumptive minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties." *Fish v. Kobach* ("*Fish I*"), 840 F.3d 710, 737, 738 (10th Cir. 2016).

45.     To rebut that presumption and require additional "proof" of citizenship, a state would need to show that, despite the attestation requirement, "a substantial number of noncitizens ha[d] successfully registered." *Id.* at 739.

46.     States subject to the NVRA are required to "accept and use" the Federal Form for voter registration by mail. *Id.* § 2050(a)(1). To comply with this directive, a state cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 20 (2013).

47.     Thus, because the Federal Form does not require applicants to submit any "proof" of eligibility beyond the attestation requirement, a state cannot require an applicant using the Federal Form to provide such "proof."

48.     The NVRA also permits states to develop and use their own forms for voter registration by mail. *See* 52 U.S.C. § 20505(a)(2). These "State Forms," however, must themselves "meet[] all of the criteria" that Federal law requires the Federal Form to meet. *Id.* As such, they can "require only such identifying information . . . and other information . . . *as is necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. § 20508(b)(1) (emphasis added). And since "attestation sufficiently confirms the eligibility of registered voters," a State Form cannot require an applicant to furnish any additional "proof" of her qualifications to vote. *Mi Familia Vota v. Fontes* ("*MFV*"), 129 F.4th 691, 713 (9th Cir. 2025) (citing 52 U.S.C. § 20508(b)(1)).

49.     The NVRA also requires states to offer voter registration forms to citizens (1) when they apply for (or apply to renew) a driver's license or other identification document at a State motor vehicle authority; and (2) at certain offices the state designates as "voter registration agencies," which must include all public assistance agencies and agencies that provide services to people with disabilities. 52 U.S.C. § 20504 (motor vehicle authorities); § 20506 ("voter registration agencies").

50.     But again, these registration forms are subject to parameters that limit what information they can demand from an applicant. Like the Federal Form, voter registration applications offered at state motor vehicle authorities "may require only the minimum information necessary to . . . enable state election officials to assess applicants' eligibility." *Id*. § 20504(c)(2)(B)(ii).

51.     State-designated "voter registration agencies" may offer prospective voters either the Federal Form or their own registration form, so long as it is "equivalent" to the Federal Form. 52

U.S.C. § 20506(a)(6)(A)(ii). Voter registration agencies can also offer the State Form, but it, too, must be "equivalent" to the Federal Form. *Id.; see also MFV*, 129 F.4th at 713.

52.     A form that requires additional information—like documentary proof of citizenship—is not "equivalent" to the Federal Form. *See MFV*, 129 F.4th at 713.

53.     Applying these statutory requirements, federal courts have held that other states' "proof-of-citizenship" requirements for voter registration violated the NVRA.

54.     Arizona was the first to pass a law requiring proof of citizenship for voter registration, which initially took effect in 2004. The U.S. Supreme Court held that it violated the NVRA as applied to federal elections. *See ITCA*, 570 U.S. at 1. Arizona's "state-imposed requirement of evidence of citizenship not required by the Federal Form," the Court explained, was "'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." *Id.* at 15 (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 397 (2001)).

55.     Arizona tried again in 2022 when it enacted a new law requiring State Form applicants to provide documentary proof of citizenship and residency and making it a felony for county recorders to fail to reject State Form applications without proof of citizenship. *MFV*, 129 F.4th at 705. The law also barred Federal Form applicants without documentary proof of citizenship from voting by mail or voting for president. *See id.*

56.     A federal district court found that these provisions, too, violated the NVRA, and enjoined their enforcement. *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1088–96 (D. Ariz. 2023).

57.     As the Ninth Circuit explained when it affirmed the district court's injunction, requiring "proof" of citizenship and residency to vote by mail and vote for President violated the NVRA's requirement that states "accept and use" the Federal Form (which has never required documentary proof of citizenship) for registration by mail. *MFV*, 129 F.4th at 710–12.

11

58.    These requirements also violated the NVRA by demanding more information than "'*necessary'* to assess an applicant's eligibility." *Id.* at 713 (emphasis added). Additional proof of citizenship was not necessary, the Court explained, because "attestation sufficiently confirms the eligibility of registered voters." *Id.* Finally, the "proof" requirements violated the NVRA's mandate that voter registration forms offered at state-designated "voter registration agencies" be "equivalent" to the Federal Form, since Arizona's form contained "unnecessary additional requirements," including documentary proof of citizenship, that the Federal Form did not. *Id.*

59.    Kansas imposed documentary proof-of-citizenship requirements for voter registration in 2011, despite "incredibly slight evidence" of noncitizen voting in the state. *Fish v. Schwab* ("*Fish II*"), 957 F.3d 1105, 1134 (10th Cir. 2020). The Tenth Circuit agreed that the law violated the NVRA and affirmed the district court's preliminary injunction. *See Fish I*, 840 F.3d at 732–51. After the district court permanently enjoined the law, the Tenth Circuit affirmed again, finding that it violated the NVRA and imposed an unconstitutional burden on the right to vote. *See Fish II*, 957 F.3d at 1121–44.

60.    More recently, in April 2025, a federal district court preliminarily enjoined part of an Executive Order issued by President Trump, purporting to impose proof-of-citizenship requirements to the Federal Form, as a violation of separation-of-powers principles, in part because Congress had already exercised its authority in this area through the NVRA. *See* Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC")*, No. CV 25-0946 (CKK), 2025 WL 1187730, at *37 (D.D.C. Apr. 24, 2025).

61.    In doing so, the court observed that, "when enacting the NVRA, Congress considered and rejected a proposal that would have allowed States to impose exactly the kind of documentary-proof-of-citizenship requirement that the President's Executive Order now directs the EAC to adopt,

concluding that such a requirement was 'not necessary or consistent with the purposes of [the] Act.'" *LULAC*, 2025 WL 1187730, at \*37 (quoting H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.)).

62.    To date, no state (or the federal government) has successfully defended a "proof of citizenship" requirement on the merits in court.[1]

**B. Louisiana's legislature passed SB 436 to solve a nonexistent problem.**

63.    In 2025, Louisiana passed SB 436, now mandating that prospective voters provide "proof of United States citizenship" when they register to vote. La. Stat. Ann. § 18:104(D)(2). The law does not specify what form that "proof" must take. *Id*.

64.    Before the enactment of SB 436, Louisiana's State Form and the Federal Form, either of which eligible Louisiana voters could use to register, La. Stat. Ann. § 18:115, already required applicants to attest that they are citizens under penalty of perjury. *See id.* § 18:104; 52 U.S.C. § 20508(b)(2). That attestation requirement remains on both forms today. *Id.*

65.    As SB 436 advanced through the legislature, neither Defendant Landry, SB 436's sponsor, nor any of SB 436's proponents provided any basis to believe that additional proof of citizenship was "necessary" for Louisiana to establish the eligibility of registrants.

66.    In particular, no one offered any evidence that any meaningful number of noncitizens have ever successfully registered to vote in Louisiana—or anywhere else in the nation. *See Fish II*, 957 F.3d at 1134 (noting "weak" trial evidence of noncitizen registration around the country).

67.    This lack of evidence was a central topic during SB 436's legislative hearings.

68.    When the Senate Committee on Senate and Governmental Affairs heard testimony on SB 436 in April 2024, the bill's sponsor, Senator Michael Fesi, was asked to provide "any instances

---

[1] A more recent law in New Hampshire requiring proof of citizenship for voter registration is currently the subject of federal litigation. *See N.H. Youth Movement v. Scanlan*, No. 1:24-cv-00291 (D.N.H. filed Sept. 17, 2024).

in the State where noncitizens have registered or voted." Senator Fesi simply responded: "Don't know. . . . don't know whether they have or not." Senator Fesi admitted later in his testimony, "the problem may not be great now."

69.    When Defendant Landry was asked similar questions about "how many [] noncitizens have voted," she offered up a similar response: "I don't think we know. We do have at least a few instances of noncitizens voting. I think we've prosecuted one of them . . . I know we've had a few complaints about it."

70.    Defendant Landry never provided the legislature with any further information about the "few complaints" she says her office received, how credible those reports were, or the basis for them. Nor did Defendant Landry provide additional information about the purported case of noncitizen voting she "think[s] [Louisiana has] prosecuted."

71.    The Heritage Foundation's database of "election fraud" reports *zero* instances of "alien" voting prosecutions occurring in Louisiana since 1982, the year in which that database begins.

72.    Like Defendant Landry and Senator Fesi, many of SB 436's other proponents readily acknowledged that there was no evidence of noncitizen voting; indeed, one member of the public who supported the bill conceded that he could not "see how [noncitizen voting] could be shown as a problem" at all. Another attested that SB 436 was "*preemptive* legislation."

73.    Rather, the legislative record suggests SB 436 was motivated by baseless conspiracy theories. A proponent of SB 436 from the Louisiana Citizen's Advocacy Group, for example, testified that there was "evidence all over the place" of noncitizen voting, in the form of what he said were "numerous videos" of "foreigners, coming, heading towards this country" wearing "political shirts" and "claiming they're going to vote." No such video was submitted into the legislative record.

74.    Defendant Landry's support for the bill appears to be based on her assumption that noncitizen voting *must* be occurring (despite no evidence to that effect). "There's been a significant

influx" of "over 7 million" "illegal aliens," Defendant Landry testified. As a result, she explained, noncitizen voting is a "concern all around the country."

75.    It is unclear clear where Defendant Landry believes that "influx" has occurred—but it could not have been Louisiana, where only 4.9% of its 4.5 million residents were born outside the United States, and of those, nearly half are naturalized citizens.

76.    The lack of corroborating evidence of noncitizen voting, even in isolated instances, is hardly surprising, because existing law already contains severe penalties for noncitizens who register or vote, including imprisonment and deportation. *See, e.g.*, 18 U.S.C. § 1015 (making it a federal crime to make a false statement about citizenship to vote in federal elections, punishable by up to five years' imprisonment); *id.* § 611 (making it a federal crime for noncitizens to unlawfully vote in any election punishable by up to a year imprisonment); 8 U.S.C. §§ 1182(a)(10)(D)(i), 1227(a)(6)(A) (providing that a noncitizen who has voted will be either barred from admission to the United States or subject to deportation, as applicable); La. Stat. Ann. § 14:133.1.1(A)(3) (providing "no person shall knowingly, willfully, or intentionally" "[r]egister, vote, or attempt to register or vote . . . in any manner other than as provided in the Louisiana Election Code"); *id.* § 14:133.1.1(B) (imposing penalties of up to two years of imprisonment for first offense and up to five years for second).

77.    Louisiana's State Form—since well before SB 436 was passed—reinforces these prohibitions: It expressly "inform[s] the applicant of the penalty for violation of applicable laws relating to registration of voters." La. Stat. Ann. § 18:104(C)(1).

78.    As one of SB 436's proponents pointed out at a Senate and Governmental Affairs Committee hearing, pre-existing laws already strongly *dissuaded* noncitizens from voting: the "last place" noncitizens who were "trying to establish a life around things like work" would go would be a "government space" for the purposes of voting illegally.

**C. SB 436 offers no guidance on what constitutes "proof" of citizenship.**

79.     Although SB 436 requires prospective voters to "include with [their] application proof of United States citizenship" when they register to vote, it does not specify what form this "proof" should take, nor expressly delegate to Defendant Landry or anyone else the authority to clarify what is required.

80.     This omission is notable, because each of the other states that has passed proof-of-citizenship requirements for voter registration has defined "proof" differently, with no two states accepting the same set of documents for that purpose. *See* Ariz. Rev. Stat. § 16-166(F) (2004); N.H. Rev. Stat. § 654:12(I)(a); Kan. Stat. Ann. § 25- 2309(l); Wyo. Stat. Ann. §§ 22-1-102(a)(lvi)(J), 22-3-103(a).

81.     For instance, New Hampshire's proof-of-citizenship law, which passed in 2024, allows voters to submit a birth certificate, passport, naturalization papers, or "any other reasonable documentation which indicates the applicant is a United States citizen." N.H. Rev. Stat. § 654:12(I)(a) (emphasis added). But when Wyoming passed a proof-of-citizenship law the following year, it omitted any catch-all option, instead requiring voters to submit at least one of the "proofs" of citizenship listed in the statute: a valid Wyoming driver's license or identification card; a valid tribal identification card from a federally recognized Indian tribe; a valid state ID that is consistent with the REAL ID Act; a valid U.S. passport; a certificate of U.S. citizenship; a certificate of naturalization; a U.S. military draft record or a selective service registration acknowledgment card; a consular report of birth abroad issued by the U.S. Department of State; or "[a]n original or certified copy of a birth certificate in the United States bearing an official seal." Wyo. Stat. Ann. §§ 22-1-102(a)(lvi)(J), 22-3-103(a) (eff. July 1, 2025).

82.     Different states' proof-of-citizenship laws also have different requirements about the form in which that "proof" can be submitted. For example, the proof-of-citizenship laws in Arizona,

New Hampshire, Kansas, and Wyoming all allow a voter to prove their citizenship by submitting a birth certificate, but the laws have different specifications about that submission. Arizona and Kansas's laws accept photocopies of the applicant's birth certificate. Ariz. Rev. Stat. § 16-166(F)(2) (2004); Kan. Stat. Ann. § 252309(l)(2). Wyoming's law accepts only "[a]n original or certified copy of a birth certificate in the United States bearing an official seal." Wyo. Stat. Ann. §§ 22-1-102(a)(lvi)(J), 22-3-103(a). And New Hampshire's law does not specify whether a photocopied birth certificate will suffice or not. N.H. Rev. Stat. § 654:12(I)(a).

1. **Legislators raised concerns about SB 436's failure to define what constitutes "proof," and Defendant Landry promised clarification *before* the law went into effect.**

83.     During discussions of SB 436, legislators expressed concern about the law's vague requirements. One senator, for example, expressed that he was "very concerned with this language 'proof of American citizenship,'" because he did not "know what that is, [or] know what it means." Another asserted that he "would really like to see what [Defendant Landry was] proposing before" voting on the law.

84.     Tethered to these concerns was the potential for a proof-of-citizenship requirement to needless burden voters. One senator, for example, pointed out the "laundry list" of information Louisiana residents were already required to provide in order to register.

85.     In response, Defendant Landry acknowledged that the law provided no specifics about what acceptable "proof" of citizenship might be. After a senator asked her to clarify "what we are asking [registrants] to attach now to the application," Defendant Landry replied, "We haven't determined that yet," and explained that she was "researching" to "find out the best practices and the best way" to "have applicants prove their citizenship."

86.     During the legislature's consideration of SB 436, Defendant Landry nevertheless assured lawmakers that her office would issue rules to clarify the proof-of-citizenship requirement *before* the bill's January 1, 2025 effective date.

87.     In fact, SB 436's proponents testified that the effective date was pushed back for the purpose of allowing Defendant Landry more time to determine what would constitute "proof" of citizenship. In response to a senator's question about whether it would instead make more sense to determine the required documentation before voting on the bill, Senator Fesi testified that "that's why we have an amendment to move the date back to January 1st." As Defendant Landry testified, "[t]he bill won't take effect until January 1st and so we have time to, you know, look at what we can ask them for and what would be appropriate to ask them for to prove their citizenship." Defendant Landry also stated that "the effective date of January 1 allows us time to change the form and have it in effect for 2025").

88.     And when another senator asked Defendant Landry whether it would instead be "wise to see what that [proof] is first," *before* passing the bill, Defendant Landry again responded: "That's why we have an amendment to make the date back to January 1."

89.     At SB 436's House and Governmental Affairs Committee hearing one month later, questions still loomed over SB 436's implementation, including how individuals could comply with SB 436 when "register[ing] to vote online," and what documentation would be required.

90.     These questions went unanswered. When asked in the House about what would constitute proof of citizenship under SB 436, the bill's sponsor, Senator Fesi, responded that the Secretary of State "normally" has "certain regulations put up," and "mainly it's a birth certificate, driver's license, whatever you know, they have a couple of items of identification to prove that they're a citizen of the United States." But when asked expressly whether SB 436 would require

passports to register to vote, Senator Fesi made no firm commitments, testifying that he didn't "think" passports would be "required at this time."

**2. Defendant Landry has not issued any guidance defining "proof of United States citizenship" or otherwise implementing SB 436.**

91.     SB 436's January 1, 2025, effective date came and went seven months ago. But Defendant Landry has still issued no guidance explaining what constitutes "proof" under SB 436's new requirement. Nor has Defendant Landry provided any other guidance about SB 436's implementation.

92.     Thus, for the last seven months, Louisiana law has required registrants to "include with [their] application proof of United States citizenship" without giving them any guidance about how to do so.

93.     On information and belief, as of the date of this filing, Louisiana still does not communicate any proof-of-citizenship requirement to prospective voters in any official documents or when accepting voter registration applications.

94.     The website for the Louisiana Secretary of State's Office informs prospective voters that, to register in person, they must "prove age, residency and identity." It says nothing about proof of citizenship.

95.     Louisiana law requires the Defendant Landry to "design and provide a standard notice" regarding the eligibility requirements for voter registration, which must be posted "in each driver's license facility of the state." La. Stat. Ann. § 18:114(D). The current version of that form tells prospective voters that they must "answer several questions to determine eligibility," but not that they must prove any additional "proof" that they are U.S. citizens.

96.    Louisiana's mail voter registration application, which is available on the Secretary of State's website, has not been revised since 2019. It does not ask voters to provide any "proof" of citizenship beyond a signed attestation to their qualifications to vote.

97.    The voter registration application provided to prospective voters at Louisiana's offices of motor vehicles also requests no "proof" of citizenship beyond the attestation. And when asked about registration requirements by members of the public, employees at Louisiana driver's license offices do not mention the proof-of-citizenship requirement.

98.    The Secretary of State's online registration portal does not request any proof of citizenship either.

99.    The State's inconsistent guidance about what voters must do to register to vote not only risks disenfranchising prospective voters who do not know they need to prove their citizenship, but it also exposes them to criminal consequences. Under Louisiana law, it is a crime to register, vote, or attempt to register or vote "*in any manner other than as provided*" in Louisiana's election code. La. Stat. Ann. § 18:1461.2(A)(3) (emphasis added). Because SB 436 provides that "[e]ach applicant" for voter registration must submit proof of citizenship, applying without such proof could potentially result in a "fine[] [of] not more than two thousand dollars or be imprisoned, with or without hard labor, for not more than two years, or both, for the first offense," and for subsequent offenses, "a fine of not more than five thousand dollars or imprisonment at hard labor for not more than five years, or both." *Id.* § 14:133.1.1(B). The specter of these criminal consequences is more than enough to chill voters from even attempting to register without a clear understanding of the law.

100.    The state's lack of guidance also places Louisiana state officials who are charged with registering voters at risk. For example, public officials or employees at Louisiana's driver's license facilities "who attempt[] to register any person without complying with the applicable provisions of

[Louisiana election law] shall be subject to a fine of not more than five hundred dollars or be imprisoned for not more than six months, or both." *Id.* § 18:114(H).

101.    Rather than risk these consequences, and absent any guidance about what constitutes acceptable proof, officials may be inclined to reject applicants who cannot definitively prove that they are citizens to the satisfaction of that particular official. These officials may also impose more stringent requirements on some prospective voters than others, based on their personal assessments of whether the person's citizenship is in question, creating a significant risk of discriminatory enforcement.

102.    Indeed, in an effort to comply with the law, local elections officials are already subjecting people to additional requirements at registration based on impermissible factors like place of birth. In April, for example, the Registrar of Voters from Lafayette Parish received an electronic voter registration application where the prospective voter listed his birthplace as Guatemala. Because of this, the Registrar sent the man a letter asking for proof of citizenship. In an email about this incident, an employee stated that demanding proof of citizenship based on birthplace is the office's regular practice. As she explained, "We normally ask for a United States passport, Naturalization paper, or their birth certificate if they were born abroad."

103.    On May 2, 2025, Plaintiff sent a letter to Defendant Landry notifying her that SB 436's proof-of-citizenship requirement violates Sections 5, 6, 7, 8, and 9 of the NVRA. *See* Ex. A. Plaintiff sent this letter electronically and via U.S. Mail. This letter served as a pre-suit notice under the NVRA. *See* 52 U.S.C. § 20501(b).

104.    Defendant Landry has yet to respond to Plaintiff's NVRA letter. Nor has Defendant Landry issued any communication to Plaintiff or the public explaining how the NVRA violations outlined in Plaintiff's letter have been addressed.

**D. Louisiana has privately initiated efforts to implement SB 436.**

105.    Although Defendant Landry has yet to provide any official guidance about how SB 436 will be enforced, Defendant Landry has crafted an implementation plan behind the scenes. Defendant Landry plans to require all applicants to provide additional information in their voter registration applications, like immigration identifier, place of birth, sex, and mother's maiden name, so that the state may use that information to attempt to verify the citizenship status of applicants using various databases.

106.    On January 30, 2025, Defendant Landry wrote to the EAC asking it to authorize Louisiana to change the state-specific instructions on the Federal Form. Defendant Landry followed up with updated requests on February 24, May 16, and most recently, June 25, 2025. In the most recent letter, Defendant Landry asked that applicants be required to provide the following information:

      a.  If applicable, the applicant must provide her "unique immigration identifier (e.g. USCIS/Alien Registration Number, Form I-94, Arrival/Departure Record number, Student and Exchange Visitor Information System (SEVIS) ID number, Naturalization/Citizenship Certificate Number, or Card Number/I-797 Receipt Number)."

      b.  If the applicant has no unique immigration identifier, the applicant must provide (1) her place of birth (State/Province/County); (2) sex; and (3) if known, the applicant's mother's maiden name.

107.    Defendant Landry also provided an alternative option, which would require all applicants to provide their place of birth, sex, mother's maiden name (if known), and unique immigration identifier (if applicable) on a separate document attached to the form.

108.    Currently, place of birth, sex, and mother's maiden name are not required of all applicants. La. Stat. Ann. § 18:104(B). The State Form includes spaces for place of birth, sex, and mother's maiden name, but they are optional fields, and place of birth and sex are designated as being used "for statistical purposes only."

109.    If the EAC authorizes the change to the Federal Form, Louisiana plans to make the same fields mandatory on the State Form too.

110.    Defendant Landry explained that these additions were necessary to implement Louisiana's proof-of-citizenship requirement. According to Defendant Landry, the state cannot currently check the citizenship status of every prospective voter, and the new required fields will allow it to do so. Although Louisiana is already "actively working with the OMV, Louisiana Department of Public Health ('LDH'), the U.S. Citizenship and Immigration Services ('USCIS'), the National Association of Public Health Statistics and Information Systems ('NAPHSIS'), and custodians of other databases to increase its access to existing information," Defendant Landry explained, the state needs to rely on "[a]dditional databases" to "fill the citizen verification gaps" in the available data. And to use these unidentified databases, Louisiana needs additional information that is not already included on the Federal Form—namely an immigration identifier, mother's maiden name, sex, and place of birth.

111.    In a signed affidavit attached to the letter to the EAC, Louisiana's Commissioner on Elections, Sherri Wharton Hadskey asserted that Louisiana "is currently coordinating with State and Federal agencies and non-governmental organizations to access additional databases through which voter eligibility checks can be performed." As examples, Ms. Hadskey listed three potential databases: (1) the Louisiana Electronic Event Registration System (LEERS), a web-based systems that includes Louisiana birth and death records; (2) the Systematic Alien Verification for Entitlements (SAVE) database operated by the U.S. Citizenship and Immigration Services, which

"verifies citizenship for citizens who have completed the naturalization process or who have acquired U.S. citizenship and applied for and received a Certificate of Citizenship"; and (3) the National Association of Public Health Statistics and Information Systems (NAPHSIS), a nonprofit organization that "enables the secure exchange of U.S. public health data through a secure platform."

112.    According to Ms. Hadskey, Louisiana must provide registration applicants' immigration identification numbers to SAVE for it to verify the applicants' citizenship.

113.    And to access NAPHSIS, Louisiana must provide NAPHSIS with each applicant's "place of birth, sex, and mother's maiden name." Ms. Hadskey does not allege that any additional information is needed to use the LEEDS database.

114.    Thus, Louisiana's request to the EAC—to require applicants to provide an immigration identifier, place of birth, sex, and mother's maiden name—appears to have been crafted with SAVE and NAPHSIS specifically in mind.

115.    Ms. Hadskey also proffers a new justification for the changes she requests. Under Louisiana law, if an applicant's registration information does not match data in either the Office of Motor Vehicles or Social Security Administration database, the registrar of voters sends the applicant a verification letter requesting additional information, which must be provided within ten days for the registration application to be accepted. If Louisiana can use other databases to verify citizenship, fewer applicants will need to respond to verification letters. This, she says, serves the goals of the NVRA by increasing voter registrations and processing them more quickly.

116.    To prove her point, Ms. Hadskey estimates that, in 2024, approximately 5.4% of voter registration applicants were "likely" sent verification letters, but if Louisiana can use additional databases, a mere 0.059% will require verification.

117.    These numbers are the product of profoundly skewed assumptions. Ms. Hadskey claims that the Social Security Administration cannot "always" find a match for applicants who

provide a social security number. But she then estimates the number of applicants who will require a verification letter by assuming that *none* of the people who submitted a social security number will be confirmed by the SSA database—dramatically inflating her estimate. On the other end, Ms. Hadskey calculates the number of applicants who will receive verification letters if Louisiana can use additional databases by assuming that *all* people run through those systems will find a match.

118.    The latter assumption is particularly misplaced, since both the SAVE and NAPHSIS databases remain unproven as accurate sources of citizenship information. *See infra* ¶¶ 126–140.

119.    Along with this new justification, Defendant Landry reiterated the original impetus for the law: concern that noncitizens are voting in Louisiana elections. Again, Defendant Landry offered nothing concrete to corroborate this claim. Her primary contention was that, between the years of 2017 and 2024, there were 124 registered voters identified as *potential* noncitizens. That amounts to about 15.5 a year, or .0005% of registered voters in Louisiana.

120.    Notably, Defendant Landry did not say that *any* of these individuals were actually confirmed to be noncitizens, nor did she say whether any of them had ever voted or even attempted to vote. Instead, she reported that the registrar of voters sent these individuals a notification to their address on file, and 97 of the 124 individuals were subsequently removed from the rolls because they did not "appear before the registrar" to demonstrate their eligibility.

121.    This only demonstrates that requiring prospective voters to take additional steps to "prove" their citizenship has a high chance of excluding qualified citizens from the franchise.

122.    There is no evidence that *any* of the people Louisiana removed from the rolls as "potential noncitizens" was, in fact, ineligible to vote.

123.    They simply failed to comply with additional demands to prove their citizenship.

124.    And the dozens of individuals who did jump through these additional hoops demonstrated that in fact they were citizens, showing that Louisiana's process is wildly inaccurate (at best).

**E.  SB 436's proof-of-citizenship requirement will make voting more difficult for qualified Louisiana voters.**

125.    Whatever form of "proof" Louisiana ultimately chooses to accept under the new law, its effect will be to make voter registration significantly more difficult for qualified voters in Louisiana and, ultimately, to exclude *citizens* from the franchise.

**1.  Louisiana's plan to "verify" citizenship through various databases will exclude voters by inaccurately flagging them as unqualified.**

126.    Louisiana's apparent current plan to implement SB 436's proof-of-citizenship requirement by demanding additional information so that the state can confirm citizenship through NAPHSIS and SAVE—rather than by requiring voters to provide additional proof of citizenship in the first instance—will almost certainly bar eligible voters from casting their ballots by producing inaccurate or ambiguous results, then putting the onus on voters to prove their eligibility.

127.    NAPHSIS manages the Electronic Verification of Vital Events (EVVE) system, which allows real-time access to birth and death certificates from some state vital records offices. But NAPHSIS does not have complete data. Nor can it, since NAPHSIS has no information about individuals born outside of the United States, and some state statutes prevent them from sharing birth and death information with NAPHSIS.

128.    Moreover, vital records may include incomplete information and misspelled names— and this issue is more likely to arise for prospective rural voters and voters of color due to disparities in systemic record-keeping. Prospective voters who come from multilingual or immigrant backgrounds are also more likely to have inaccurate records because of misspellings in their names.

129.    Prospective voters who have changed their names—like women who have done so after marriage—are also more likely to be mismatched or subject to other errors in the NAPHSIS system, since the birth certificates it relies upon will include only the individual's name at birth.

130.    The SAVE system is similarly flawed and will almost certainly identify qualified voters as noncitizens (or "unconfirmed"), many of whom will have no realistic means of correcting the problem in time to avoid being disenfranchised.

131.    For various reasons, SAVE results are not always accurate. For example, because of lag times in updating federal databases, some people who were recently naturalized are still misidentified as "noncitizens" in the database. And like the NAPHSIS database, certain groups of people are especially likely to be erroneously mismatched or marked "unconfirmed" by the system— like women who have changed their names after marriage but have their original names on the immigration or naturalization documents SAVE uses.

132.    Therefore, to access SAVE, local election officials must first agree to verify any "noncitizen" or "unconfirmed" results through a manual search of other federal databases.

133.    In its most recent rigorous review of SAVE in 2017, the Government Accountability Office ("GAO") found that 15–19% of SAVE queries required additional verification.

134.    And yet, according to the GAO, for about 60% of queries that required additional verification, the local agency never completed it. Over a five-year time period, this amounted to approximately 8.5 million unverified checks out of 86.6 million. Worse, the GAO found that USCIS "lack[ed] sufficient controls to help ensure agencies are completing the necessary steps."

135.    Where local agencies do attempt the additional verification, the process will likely require voters to submit additional documents. USCIS currently advises that "[i]f SAVE requests additional immigration documents, the user agency must request the applicant or registered voter's proof of U.S. citizenship or immigration documentation."

136.    Meanwhile, for people who are wrongly identified as "noncitizens" in SAVE, there is no streamlined process for correcting this information. To start, prospective voters may not even be aware of any error until their voter registration application is rejected. The onus is then on the prospective voter to correct the problem, a burdensome and often byzantine process. The individual must first determine what document is causing the error. If the individual does not already know, she must submit a Freedom of Information Act request, and often wait weeks for a response.

137.    The process for actually correcting a document differs depending on the agency that maintains it.

138.    For example, U.S. Customs and Border Control can only make corrections at a port of entry.

139.    In May 2025, the U.S. Department of Governmental Efficient ("DOGE") and the U.S. Department of Homeland Security ("DHS") implemented a major overhaul of SAVE, which intensifies the risk of errors. While local agencies previously had to search individuals one at a time, SAVE now permits them to search hundreds of thousands of names at once. SAVE also now has access to the Social Security Administration's central database, which, as Louisiana's Elections Commissioner recognized, does not always provide definitive information about a person's citizenship.

140.    At the same time, the federal government has undermined oversight over SAVE by effectively shutting down the USCIS ombudsman and DHS Office for Civil Rights and Civil Liberties. Given these sweeping changes, alongside previous issues with the database's accuracy, the nonpartisan organization Center for Responsive Government recommends that "state elections officials" use SAVE "in limited circumstances as its accuracy and effectiveness are being determined."

141.    Louisiana has acknowledged that the other databases at their disposal are outdated, unreliable, and incomplete as a source of voter citizenship information. For example, Defendant Landry has acknowledged that Office of Motor Vehicle ("OMV") data is currently housed in an internal operating system and databases which are more than 50 years old. While OMV is attempting to update its systems, Defendant Landry has expressed concern that it is "unclear how long this process will take or whether OMV has sufficient funding to complete the upgrades." And while OMV has recently updated its internal procedures to begin documenting lawful permanent resident status in its records, election officials were not able to verify citizenship using OMV data before 2024, and it's not clear that OMV data would be accurate and reliable to verify citizenship in the future.

142.    Louisiana's attempt to use OMV data to verify citizenship is particularly problematic for naturalized citizens. Individuals who are not yet naturalized may obtain a driver's license and be listed in the OMV database as noncitizens. La. Stat. Ann. § 32:409.1. Louisiana statute does not require drivers to update their OMV data with their citizenship status once they naturalize, so for many naturalized citizens, their motor vehicle records will be out of date and not reflect their accurate citizenship status. Naturalized citizens will therefore be singled out for further examination or unable to register to vote due to Louisiana's reliance on outdated OMV data.

**2. Requiring additional information at voter registration burdens prospective voters and may chill them from registering.**

143.    In an effort to verify voter citizenship using databases, Louisiana currently plans to require voter registration applicants to submit additional information, including their place of birth, sex, and (if known) mother's maiden name.

144.    Many of the issues identified above arise even for voters who are able to provide their information accurately. But many other voters—including many of the students that Plaintiff helps

to register at voter registration drives—simply do not have access to required information like immigration identifier, place of birth, and mother's maiden name.

145. Requiring additional information will increase the burden on prospective voters who may not readily have access to this information or be wary about providing it. For example, naturalized citizens are often hesitant to share information like birthplace with the government for fear that they may be wrongly targeted or that it may compromise noncitizen family members.

146. Further still, the more information a voter registration application requires, the greater the chances an otherwise qualified voter may be excluded due to clerical errors (like writing the current date instead of one's birthdate). Voters also commonly enter birthplace information in a non-uniform manner that election officials are unable to decipher. For instance, the birthplace field Louisiana has proposed would ask the voter to list her "State/Province, County." If a voter writes "CA," this could refer to either California or Canada. *MFV*, 129 F.4th at 722. Because Louisiana plans to use this information to search for voters in various databases, these errors further increase the likelihood of erroneous results.

### 3. Other citizenship-verification methods will burden qualified voters.

147. Other methods of establishing prospective voters' citizenship at registration (aside from the affirmation requirement) would also burden and exclude qualified voters. The reason is simple: many otherwise qualified voters do not have the documents commonly used to prove citizenship and would struggle to obtain them due to logistical barriers or their expense. Many more do have these documents but will be unable to access them when they need to register.

148. The potential "proofs" of citizenship that Defendant Landry identified in her testimony supporting SB 436 illustrate the point.

149.    Although Defendant Landry did not commit to accepting or requiring any particular documents, she cited passports, certificates of citizenship, and birth certificates as examples of what might constitute sufficient proof of citizenship under the law.

150.    Only 30.4% of Louisiana citizens have a valid passport, and obtaining one normally costs $165 and takes as long as 10 weeks, or longer when the State Department is backlogged.

151.    One senator remarked during the hearings on SB 436, there is a "backlog" for citizens applying for passports and that "one of the biggest requests that [he] receive[s]" in his district office is "assistance with people getting passports because of the backlog and the delays."

152.    These long document processing and wait times pose an especially high risk of excluding qualified voters in Louisiana, where prospective voters are required to register at least thirty days before an election if doing so by mail, and at least twenty days prior if registering online. *See* La. Stat. Ann. § 18:135.

153.    Obtaining certificates of citizenship, which Defendant Landry also mentioned in her testimony, similarly entails long wait times: processing times for those documents range from three to six months.

154.    During the hearings on SB 436, one senator stated that he could not "imagine how long it would take the U.S. government to provide" certificates of citizenship to individuals intending to register to vote.

155.    Birth certificates are also not always simple to obtain.

156.    Louisiana charges $15 per copy for birth certificates, plus applicable surcharges. Standard processing times for birth certificates in Louisiana are amongst some of the highest in the country, taking between 8 and 10 weeks for mailed requests, and there is only one office in the entire state for individuals to make in-person requests.

157.   And, as an authorized online ordering service for Louisiana vital records warns, "due to the effects of Hurricane Katrina, not all records are currently accessible."

158.   Moreover, for many voters—even voters born in the United States—birth certificates will not by themselves prove citizenship. Women, in particular, face additional barriers. More than 80% of American women change their names when they marry or divorce. As a direct consequence, a significant portion of women do not have documents that match their current legal name. According to data published by the Center for American Progress, close to one million women in Louisiana have names that do not match their birth certificates. Among them are several of Plaintiff's members.

159.   Further still, it is unclear whether Louisiana will accept birth certificates as proof of citizenship at all. After SB 436's effective date passed, Defendant Landry praised an executive order signed by President Trump purporting to add proof-of-citizenship requirements to the Federal Form, claiming that it would allow Louisiana to "more quickly be able to implement and enforce" SB 436.

160.   Now enjoined in federal court, that executive order would *not* have deemed birth certificates sufficient proof of citizenship. *See* Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025); *LULAC*, 2025 WL 1187730, at *62 (temporarily enjoining proof-of-citizenship requirement).

161.   Given these and other barriers, other states proof-of-citizenship laws have consistently disenfranchised qualified citizens—despite variations in the scope of acceptable "proof" these laws allow.

162.   After the Supreme Court found that Arizona's proof-of-citizenship law violated the NVRA as applied to federal elections, Arizona implemented a system that created two classes of voters: those who provided proof of citizenship when they registered could vote in any election, while those who did not were designated as "Federal-Only" voters and allowed to vote only for federal offices. By July 2023, there were 19,439 active "Federal-Only" voters in Arizona: that is,

people who did not provide proof of citizenship required under the law, and whose franchise in state elections has been extinguished because of it.

163.    There is *zero* evidence that even one "Federal-Only" voter in Arizona is not a citizen. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1011 (D. Ariz. 2024) (noting "the absence of evidence that Arizona's 19,439 Federal-Only Voters are non-citizens"), *aff'd in part, vacated in part on other grounds, remanded*, *MFV*, 129 F.4th at 691.

164.    After Kansas's proof-of-citizenship law took effect (but before it was enjoined), *31,089* people had their applications to register to vote canceled because they did not provide satisfactory proof-of-citizenship. *Fish II*, 957 F.3d at 1128. Ultimately, "approximately 12% of the total voter registration applications submitted [after] the law was implemented" were suspended or canceled. *Id.* (internal citation omitted).

165.    And after the first elections conducted after New Hampshire passed its proof-of-citizenship law in 2024, non-partisan election observers found that 25–30% of new voters in some New Hampshire towns were turned away because they did not have the proof the law required. Election officials reported similar effects: in two New Hampshire towns, election officials reported that around 20% of New Hampshirites who tried to register at the polls were turned away because of the new law.

166.    Nothing suggests that Louisiana's law would somehow avoid these grim results. Indeed, Louisiana's voter registration rate, at 66% as of November 2024, is already the second worst in the country. If Louisiana wishes to ensure its elections reflect the will of its people, it should be making voter registration easier, not more difficult.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. §§ 20505(a), 20508(b) (Necessary to Assess Provision)**
**(Against Secretary of State Landry)**

167.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

168.    States may, under Section 6 of the NVRA, develop and use their own mail voter registration form.

169.    But a state's voter registration form must still comply with Section 9 of the NVRA, which provides that the State Form may require only the information "necessary to enable the appropriate State election official to assess the eligibility of the applicant." 52 U.S.C. §§ 20505(a)(2), 20508(b)(1).

170.    A requirement is not "necessary" where "attestation sufficiently confirms the eligibility of registered voters." *MFV*, 129 F.4th at 713 (citing 52 U.S.C. § 20508(b)(1)).

171.    SB 436's proof-of-citizenship requirement violates 52 U.S.C. § 20508(b)(1) because additional proof of citizenship is not "necessary" to assess prospective voters' eligibility.

172.    That proof of citizenship is not necessary under the NVRA is consistent with the NVRA's Conference Committee Report, which concluded that requiring such proof was "not necessary or consistent with the purposes of this Act." H.R. Conf. Rep. No. 103-66, 1993 WL 235764, at *23 (Apr. 28, 1993) (emphasis added); *cf. MFV*, 129 F.4th at 719 ("The ordinary meaning of 'necessary' is 'essential,' and the challenged requirement of [proof of citizenship] . . . is not 'essential' because the checkbox requirement already gives proof of citizenship.").

173.    Louisiana's State Form has required, even before SB 436's enactment, applicants to attest to their citizenship under penalty of perjury. La. Stat. Ann. § 18:104(D).

174.    Despite Defendant Landry's insistence that SB 436 is necessary to safeguard Louisiana's elections, neither Defendant Landry, SB 436's proponents, or any other representative of Louisiana offered any evidence before the legislature that a proof-of-citizenship requirement above attestation is "necessary" to assess voting eligibility.

175.    Neither Defendant Landry nor any of SB 436's legislative proponents advanced any evidence that attestation has been insufficient to ensure that only citizens can register to vote.

176.    Any additional proof of citizenship required by SB 436 beyond attestation is not necessary for Louisiana to assess voter eligibility, and as such, SB 436 violates Sections 6 and 9 of the NVRA.

### COUNT II
### Violation of National Voter Registration Act of 1993
### 52 U.S.C. § 20506(a)(6)(A)(ii) (Registration Agency Provision)
### (Against Secretary of State Landry)

177.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

178.    The NVRA requires each state to designate agencies for the registration of voters in elections for federal office: (A) all offices in the state that provide public assistance; and (B) all offices in the state that provide state-funded programs primarily engaged in providing services to persons with disabilities. 52 U.S.C. § 20506(a)(1)–(2).

179.    These state agencies are designated under the NVRA as "voter registration agencies" and they must, among other things, distribute voter registration forms, assist people with completing them, and accept the completed forms. *Id.* § 20506(a)(4)(A).

180.    Public assistance offices in Louisiana that are required to provide voter registration services include the Supplemental Nutrition Assistance Program (SNAP), Medicaid program, the supplemental food for Women, Infants and Children (WIC) program, the Family Independence

Temporary Assistance Program (FITAP), the Kinship Care Subsidy Program (KCSP), and the Child

Care Assistance Program (CCAP) or their successor programs. *See* La. Stat. Ann. § 18:116.

181.    Disability offices required to provide voter registration services include the Office of

Behavioral Health (OBH), Office for Citizens with Developmental Disabilities (OCDD), Louisiana

Commission for the Deaf (LCD), Office of Aging and Adult Services (OAAS), Rehabilitation

Services, and Disability Service offices at colleges and universities.

182.    The NVRA allows voter registration agencies to offer prospective voters either the

Federal Form or the State Form, so long as the State Form is "equivalent" to the Federal Form. 52

U.S.C. § 20506(a)(6)(A)(ii).

183.    But SB 436 requires that each voter registration applicant—including those who apply

at "voter registration agencies"—provide proof of citizenship along with their State Form.

184.    Any State Form that requires additional proof of citizenship is not "equivalent" to the

Federal Form.

185.    Any additional proof-of-citizenship requirement imposed by SB 436 on individuals

applying at voter registration agencies violates Section 7 of the NVRA.

**COUNT III**
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20507(a)(1) (Ensure Registration Provision)**
**(Against Secretary of State Landry)**

186.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

187.    Section 8 of the NVRA sets forth requirements that states must follow when

administering voter registration for federal elections. It requires that states "ensure that any eligible

applicant is registered to vote in an election" within a certain timeframe, depending on how they

submitted their application. 52 U.S.C. § 20507(a)(1).

188.    A registrant demonstrates their voting eligibility by submitting a registration form attesting to eligibility.

189.    Under Section 8 of the NVRA, it is unlawful to deny registration to facially eligible applicants for failing to submit additional proof of citizenship beyond attestation.

190.    Louisiana's failure to register facially eligible applicants for failing to submit additional proof of citizenship pursuant to SB 436 violates Section 8 of the NVRA.

**COUNT IV**
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20505(a)(1) (Accept and Use Provision)**
**(Against Secretary of State Landry)**

191.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

192.    Section 6 of the NVRA requires states to "accept and use" the federal mail voter registration form developed by the U.S. Election Assistance Commission. 52 U.S.C. § 20505(a)(1).

193.    To comply with this directive, a state cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *ITCA*, 570 U.S. at 20.

194.    The Federal Form does not require applicants to attach or include any additional documentation with their application to register to vote.

195.    To the extent SB 436 requires individuals applying to vote via the Federal Form to provide proof of citizenship as a condition on registration, that requirement is unlawful under Section 6 of the NVRA.

**COUNT V**
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20504(c)(2)(B)(ii) (Motor Vehicle Provision)**
**(Against Secretary of State Landry)**

196.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

197.    Section 5 of the NVRA provides that voter registration applications offered at state motor vehicle authorities "may require only the minimum information necessary to . . . enable state election officials to assess the eligibility of the applicant." 52 U.S.C. § 20504(c)(2)(B)(ii).

198.    SB 436's requirement that voters produce documentary proof of citizenship violates Section 5 because proof of citizenship is not "necessary" to assess prospective voters' eligibility.

199.    Consistent with the NVRA, prospective voters are already required to attest that they are U.S. citizens and sign the attestation under penalty of perjury. *See* 52 U.S.C. § 20504(c)(2)(C); La. Stat. Ann. § 18:104(D).

200.    Louisiana has not—and cannot—establish that the attestation requirement is inadequate to ensure that only citizens vote. *See Fish I*, 840 F.3d at 737, 739 (finding that Congress made the attestation requirement the "presumptive minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties," and that to rebut that presumption, a state would have to show that "a substantial number of noncitizens ha[d] successfully registered" despite that requirement).

201.    Louisiana has failed to overcome the presumption that attestation constitutes the minimum amount of information necessary for a state to carry out its eligibility assessment and registration duties and has not demonstrated that substantial numbers of noncitizens successfully registered to vote notwithstanding the already-existing attestation requirement.

202.    Accordingly, SB 436's proof-of-citizenship requirement violates Section 5 of the NVRA.

**COUNT VI**
**Materiality Provision of the Civil Rights Act of 1964**
**52 U.S.C. § 10101(a)(2)(B); 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202**
**(Materiality Provision)**
**(Against All Defendants)**

203.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

38

204.    The Materiality Provision of the Civil Rights Act of 1964 prohibits individuals "acting under color of law" from denying anyone the right "to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

205.    The Materiality Provision "requires invalidation of any voting prerequisite that does not convey 'material' information that has a probability of affecting an election official's eligibility determination." *MFV*, 129 F.4th at 720. The missing or incorrect information "need not be absolutely essential to determine if a person is eligible to vote, but it must have probable impact on eligibility to vote." *Id.*

206.    The Materiality Provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Id.* (citing *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003)).

207.    Under Louisiana law, individuals who meet the following qualifications are eligible to vote under state law: (1) are United States citizens; (2) are at least 18 years old by Election Day; (3) reside in Louisiana and the parish in which they seek to vote; (4) have not been legally declared "mentally incompetent" by a court or subject to a limited interdiction with suspension of voting rights; (5) are not currently imprisoned for a felony conviction. La. Stat. Ann. §§ 18:101, 102.

208.    Louisiana's selected method of implementing SB 436 violates the Materiality Provision. Defendant Landry has asked the EAC to change the Louisiana-specific instructions on the Federal Form, adding required fields such as immigration identifier, place of birth, sex, and mother's maiden name (if known). Louisiana plans to make the same additions to the State Form as well.

209.    An individual's failure to include place of birth, sex, and mother's maiden name is an "error or omission on any record or paper relating to" a requisite to voting. *See* 52 U.S.C. § 10101(a)(2)(B). Louisiana's refusal to register individuals who fail to provide that information is a denial of that individual's right to vote.

210.    The submission of place of birth, sex, and mother's maiden name is not material to whether an individual is qualified to vote. Louisiana law does not list place of birth, sex, and mother's maiden name as prerequisites to vote, and these fields tend to be inaccurate and of limited utility to verify an individual's identity or voter eligibility. La. Stat. Ann. §§ 18:101, 102 (stating voter qualifications); *see also MFV*, 129 F.4th at 722 ("[B]irthplace has no probable impact in determining eligibility to vote.").

211.    While Louisiana may purport to require this information to prevent voter fraud, courts have rejected the contention that any information that "could help prevent voter fraud" is material. *La Union del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 745 (W.D. Tex. 2023) (collecting cases). Once a voter has demonstrated their voting eligibility, "additional requirements that confirm identity are not material to determining whether the applicant or voter is qualified to vote [] and compounds the chance for error and disenfranchisement." *Id.* at 755 (citing *Schwier*, 340 F.3d at 1294). States cannot require voters to provide redundant information to confirm qualifications that the voter has already established, even as a prophylactic measure against voter fraud. *Id.*

**COUNT VII**
**Violation of the First and Fourteenth Amendments**
**42 U.S.C. § 1983**
**(Unconstitutionally Vague)**
**(Against All Defendants)**

212.    Plaintiff incorporates each Paragraph set forth above as if set forth fully herein.

213.    Under the Fourteenth Amendment to the U.S. Constitution, states are proscribed from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

214.    A law is unconstitutionally vague if it "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001).

215.    "Vague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966).

216.    "It is well established that when laws may infringe upon sheltered First Amendment freedoms, the Constitution demands they be held to stricter standards of definiteness." *Angelico v. State of La.*, 593 F.2d 585, 588 (5th Cir. 1979) (collecting cases).

217.    But "[e]ven when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

218.    "Where a statute or rule does not itself provide fair notice of what it proscribes, an agency might adopt a clarifying interpretation sufficient to provide fair notice. An agency may not, however, use such an interpretation, even if it is reasonable, as a basis for sanctioning conduct that *preceded* its issuance." 32 Wright & Miller's Fed. Prac. & Proc. § 8141 (2d ed. updated May 22, 2025) (emphasis added).

219.    SB 436 regulates the conduct of individuals by requiring "each applicant" registering to vote to "include with his application proof of United States citizenship."

41

220. Because SB 436 regulates the contents and attachments that must be "included" with acceptable voter registration applications, it also regulates voting organizations themselves, like Plaintiff, who assist individuals with registering to vote.

221. SB 436's proof-of-citizenship requirement implicates Plaintiff's First Amendment rights because it affects Plaintiff's voter registration and voter assistance activities.

222. SB 436's proof-of-citizenship requirement also implicates the First Amendment rights of voting-eligible Louisiana citizens because it burdens and regulates these citizens' abilities to register to vote.

223. Likewise, SB 436's proof-of-citizenship requirement implicates voting-eligible Louisiana citizens' fundamental right to vote under the First and Fourteenth Amendments.

224. SB 436 does not define "proof of United States citizenship." Nor does it specify whether attestation of citizenship will continue to constitute "proof of citizenship" and, if not, what forms of documentation will suffice to prove citizenship.

225. Despite assuring legislators that she would define what constitutes "proof of citizenship" *before* SB 436's effective date, Defendant Landry has not done so.

226. SB 436 does not specify whether individuals can continue to register to vote using Louisiana's online voter registration portal, and, if so, whether any required documentation must be provided in person or as photocopies.

227. The text of SB 436 does not provide fair notice to Plaintiff or other voter registration organizations about how to comply with SB 436's proof-of-citizenship requirement in assisting voters in registering to vote, and Defendant Landry has provided no guidance to make up for the text's lack of clarity.

228. The text of SB 436 does not provide fair notice to Plaintiff or other voter registration organizations about whether individuals who registered to vote after January 1, 2025 will be required

to supplement their voter registration forms with additional evidence of citizenship, and Defendant Landry has provided no guidance to make up for the text's lack of clarity.

229.    The text of SB 436 does not provide fair notice to eligible Louisiana voters about how to comply with SB 436's proof-of-citizenship requirement, and Defendant Landry has provided no guidance to make up for the text's lack of clarity.

230.    The text of SB 436 does not provide fair notice to Louisiana election officials about how to comply with SB 436's proof-of-citizenship requirement, and whether submitting registration applications without documentary proof of citizenship will subject them to criminal or other penalties, and Defendant Landry has provided no guidance to make up for the text's lack of clarity.

231.    Accordingly, SB 436 is unconstitutionally vague.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

a) Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that SB 436 violates the National Voter Registration Act;

b) Declaring that Louisiana's implementation of SB 436 through the requirement of additional information violates the Materiality Provision of the Civil Rights Act of 1964;

c) Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that SB 436 violates the First and Fourteenth Amendments to the U.S. Constitution;

d) Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that all Louisiana citizens who registered to vote using the existing State and Federal Forms after January 1, 2025, are lawfully registered;

e) Enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing SB 436's proof-of-citizenship requirement;

f) Enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from rejecting or refuse to accept a voter registration application due to missing immigration identifier, birthplace, sex, or mother's maiden name;

g) Awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

h) Granting such other and further relief as the Court deems just and proper.


Dated: August 1, 2025                         Respectfully submitted,

                                              /s/ William Most
                                              WILLIAM MOST (La. Bar No. 36914)
                                              **MOST & ASSOCIATES**
                                              201 Saint Charles Ave., Ste. 114 #101
                                              New Orleans, LA 70170
                                              williammost@gmail.com
                                              Tel: (504) 509-5023

                                              David R. Fox*
                                              Katie Chamblee-Ryan*
                                              Qizhou Ge*
                                              James J. Pinchak*
                                              **ELIAS LAW GROUP LLP**
                                              250 Massachusetts Avenue NW, Suite 400
                                              Washington, D.C. 20002
                                              dfox@elias.law
                                              kchambleeryan@elias.law
                                              age@elias.law
                                              jpinchak@elias.law
                                              Tel: (202) 968-4490

                                              *Attorneys for Plaintiff*
                                              *National Council of Jewish Women, Greater*
                                              *New Orleans Chapter*

                                              *Motion for Admission Pro Hac Vice*
                                              *forthcoming*